**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON**

**DAVID JOE COOK,**

**Plaintiff,**

**v.**                                                      **CASE NO. 2:11-cv-00485**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

**Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.   This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).   Neither party has submitted briefs in support of their positions.

Plaintiff, David Joe Cook (hereinafter referred to as "Claimant"), filed an application for DIB on April 14, 2009, alleging disability as of October 6, 2008, due to fracture of the C4 vertebrae, left shoulder pain, back pain, tingling in the left hand and foot, high cholesterol and depression.   (Tr. at 132-33, 160.)   The claim was denied initially and upon reconsideration.   (Tr. at 78-82, 84-86.)   On February 3, 2010, Claimant requested a hearing before an Administrative Law Judge ("ALJ").   (Tr. at 89-90.)   The hearing was held on July 13, 2010, before the Honorable Michelle Wolfe. (Tr. at 36-73.)   By decision dated July 20, 2010, the ALJ determined that Claimant was

not entitled to benefits.    (Tr. at 13-25.)    On May 11, 2011, the Appeals Council considered additional evidence from the Claimant, but determined it did not provide a basis for changing the ALJ's decision.    (Tr. at 1-5.)    On July 18, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.    See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).    A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."    42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.    20 C.F.R. § 404.1520 (2010).    If an individual is found "not disabled" at any step, further inquiry is unnecessary.    Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.    Id. § 404.1520(b).    If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.    Id. § 404.1520(c).    If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.    Id. § 404.1520(d).    If it does, the claimant is found disabled and awarded benefits.    Id.    If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.    Id. § 404.1520(e).    By satisfying inquiry four, the claimant establishes a prima facie case of disability.    Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).    The burden then shifts to the Commissioner,

McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. § 404.1520(f) (2010).   The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.   (Tr. at 15.)   Claimant's insured status did not expire until December 31, 2011. Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of status post C4 fracture and left clavicle fracture, major depressive disorder, generalized anxiety disorder and cognitive disorder.   (Tr. at 15.)   At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.   (Tr. at 16.)   The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.   (Tr. at 18.)   As a result, Claimant cannot return to his past relevant work.   (Tr. at 23.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as laundry aide and bakery worker, which exist in significant numbers in the national economy.   (Tr. at 24.)   On this basis, benefits were denied.   (Tr. at 25.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner

3

denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.   <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).   Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."   <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner in this case is not supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was forty-five years old at the administrative hearing.   (Tr. at 42.) Claimant completed the tenth grade after repeating two grades and has difficulty reading and writing.   (Tr. at 43.)   In the past, he worked as a truck and dump truck driver.   (Tr. at 45, 66.)

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it briefly below.

Evidence before the ALJ

The record includes Claimant's school records.   Claimant received As, Bs and Cs in elementary school.   His grades worsened to Cs, Ds and Fs in high school.   (Tr. at 218.)   He repeated the tenth grade before he dropped out with failing grades in the second semester.   (Tr. 219.)   The record includes standardized testing results.   (Tr. at 221.)

In 2000, Claimant was driving a coal truck that turned over.   X-rays showed a minimal degree of vertebral body height loss at L3 consistent with a fracture.   However, the age was indeterminate.   There was no evidence of cortical disruption to suggest an acute injury and, therefore, could be evidence of previous trauma.   (Tr. at 224.)

On October 6, 2008, Claimant reported to the emergency room after the concrete truck he was driving rolled in a motor vehicle accident.   Claimant lost consciousness. Claimant reported a history of good health except for low back pain and anxiety.   A CT of the head showed soft tissue swelling of the right scalp, but was otherwise negative. (Tr. 241.)   Left shoulder x-rays showed a left clavicular fracture.   (Tr. at 243.)   The impression was C4 fracture, concussion, left clavicle fracture and right parietal scalp laceration.   (Tr. at 229.)   Fred Armbrust, M.D. conducted a neurosurgical consultation. Claimant had excellent strength in his extremities and normal sensation throughout. The plan was to observe Claimant and mobilize him with a cervical collar.   (Tr. 233-34.)

On October 31, 2008, Claimant underwent x-rays of the cervical spine.   There were no fractures or dislocations.   The lateral mass fracture at C4 demonstrated on the CT of October 6, 2008, was not identified on plain film.   (Tr. at 227.)

On December 12, 2008, claimant underwent x-rays of the cervical spine.   The

study consisted of upright lateral views obtained in neutral, flexion and extension positions.   They revealed no evidence of instability.   (Tr. at 226.)

On January 16, 2009, Claimant underwent x-rays of his c-spine.   He had a history of stiffness and soreness, twitching of the neck and pain radiating into the left shoulder.   The x-rays were negative.   (Tr. at 225.)

The record includes treatment notes from Harry H. Fathy, M.D. dated October 15, 2008, through April 3, 2009.   (Tr. at 257-69.)   On October 15, 2008, Dr. Fathy noted that he had seen Claimant in the intensive care unit after his truck accident.   Claimant had bruising and swelling over the left clavicle.   Neurovascular examination of the left upper extremity was normal.   Claimant could move his finger and wrist freely.   X-rays in the office revealed a comminuted minimally displaced fracture of the left clavicle. Claimant requested pain medication, and was prescribed Vicodin.   Claimant was to return in one week.   (Tr. at 257.)   On October 22, 2008, Dr. Fathy noted that Claimant had not been wearing his sling properly so he had a good amount of discomfort.   Dr. Fathy adjusted it.   Claimant had a good neurovascular examination.   Dr. Fathy told Claimant that if he did not heal, he may have to have open reduction and internal fixation.   Claimant requested pain medication, which was prescribed.   (Tr. at 258.) On October 31, 2008, Claimant's left shoulder was the same.   Claimant's clavicle was improving progressively.   (Tr. at 258.)   On November 21, 2008, Claimant was six weeks post injury.   He had discarded the sling and was doing well.   Claimant had good range of motion, especially abduction and external rotation.   Dr. Fathy noted that clinically, the fracture seemed to be uniting well.   He noted that x-rays looked good.   (Tr. at 259.)

On December 12, 2008, Dr. Fathy noted that Claimant's left clavicle was doing

very well.   Dr. Fathy felt that it "[seemed] to be clinically healed."   (Tr. at 260.)
Claimant had good range of motion including abduction and external rotation.
Claimant complained of some paresthesia of the left upper extremity and on clinical
examination he had somewhat lazy instrinsics in his left hand, which Dr. Fathy believed
was related to his neck injury.   Claimant was scheduled to see Dr. Armbrust for his neck.
Dr. Fathy planned to recheck in two weeks, and if Claimant's neck condition was
resolved, he planned to release him to work.   (Tr. at 260.)

On December 31, 2008, Dr. Fathy noted that Claimant had not done much
driving.   Claimant complained of mild occipital headaches. The range of motion of the
left shoulder had improved, but was not completely normal.   Claimant had some trigger
points over the right trapezoid.   Claimant had an upcoming appointment with Dr.
Armbrust in January.   The plan was for Claimant to return after this appointment and,
if Claimant was symptom free, Dr. Fathy would release him.   Dr. Fathy noted that
Claimant no longer had a job because his employer went out of business.   (Tr. at 260.)
On January 21, 2009, Dr. Fathy noted that Dr. Armbrust released Claimant.   Claimant
reassured Dr. Fathy that he had been improving progressively.   Claimant complained of
some pain at the base of the neck on the left side over the trapezius muscle.   On clinical
examination, Claimant had almost normal range of motion.   The neurovascular
examination was intact.   X-rays revealed that his fracture was solidly united.   Dr. Fathy
released Claimant to work.   He told Claimant that if he has pain with regards to trigger
points, he may require injections of corticosteroids.   (Tr. at 261.)

On March 27, 2009, Claimant reported to Dr. Fathy that he had been unable to
work.   Claimant had pain over his left shoulder and at the base of the knee of the left

7

side.   Neurovascularly Claimant was intact.   Claimant had slight weakness of grip in the left hand in comparison to the right.   Claimant had multiple trigger points over the left trapezius, left rhomboid and elsewhere.   Claimant also had neck stiffness, but his range of motion was still fairly good considering his problems.   Claimant also had left foot pain.   Dr. Fathy administered a paravertebral block.   (Tr. at 262.)   On March 30, 2009, Claimant reported that the paravertebral block in the left trapezius muscle helped him.   Claimant had improved range of motion.   Claimant had another tender point, and Dr. Fathy administered a second paravertebral block.   (Tr. at 262.)   On April 9, 2009, Dr. Fathy noted that Claimant was improving "progressively, but slowly."   (Tr. at 263.)   Claimant still had some symptoms in the left upper extremity and complained of some pain over the medial side of the left ankle.   Dr. Fathy felt that Claimant could return to work, and recommended that Claimant undergo rehabilitation to return to work.   Claimant reported that "[h]e has been working real hard on it to get a job, to do light work initially but he has had no luck."   (Tr. at 263.)   Workers' compensation would not order rehabilitation because Claimant was already released to work.   (Tr. at 263.)

On August 27, 2009, Lester Sargent, M.A. examined Claimant at the request of the State disability determination service.   Claimant reported completing the tenth grade and stated that he was not in special education classes.   Claimant reported that he attempted and failed the GED.   (Tr. at 272.)   Mr. Sargent diagnosed major depressive disorder, single episode, moderate without psychotic features, generalized anxiety disorder and cognitive disorder, not otherwise specified, provisional on Axis I.   He deferred an Axis II diagnosis.   Claimant's prognosis was poor.   (Tr. at 273-74.)

On September 10, 2009, Stephen Nutter, M.D. examined Claimant at the request of the State disability determination service.   Dr. Nutter diagnosed chronic back pain and arthralgia.   (Tr. at 282.)

On September 11, 2009, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant's mental impairments resulted in mild restriction in activities of daily living, moderate difficulties in maintaining social functioning and concentration, persistence and pace and no episodes of decompensation of extended duration.   (Tr. at 284-97.)

The State agency source completed a Mental Residual Functional Capacity Assessment and opined that Claimant was moderately limited in some areas of functioning.   (Tr. at 298-301.)

On October 1, 2009, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work, reduced by an occasional ability to climb ladders, ropes and scaffolds and crawl, and a need to avoid concentrated exposure to vibration and hazards.   (Tr. at 303-10.)

The record includes treatment notes from Fred Armbrust, M.D. dated November 5, 2008, through February 5, 2009.   On November 5, 2008, Dr. Armbrust examined Claimant just over two weeks after his accident.   Claimant reported no problems with numbness, tingling or weakness in the extremities.   Claimant had good strength in the upper extremities.   Sensation was grossly intact to light touch.   He had no hyperreflexia.   Gait was nonspastic.   X-rays showed good alignment and no evidence of subluxation or dislocation.   Dr. Armbrust instructed Claimant to wear his cervical collar.  (Tr. at 318.)   On February 5, 2009, Claimant had no radicular symptoms, but

9

had some stiffness in his neck.   Overall, Claimant was doing reasonably well.   Claimant was still uncomfortable at night and requested medication.   Range of motion in the neck was mildly limited in all directions.   There was no objective deficit relative to weakness, reflex asymmetry or sensory loss.   Gait was normal.   Claimant was instructed to taper and discontinue use of the cervical collar over the next couple of weeks and return for follow up in five weeks for x-rays.   (Tr. at 320.)

On July 5, 2010, Mari Sullivan Walker, M.A. conducted a consultative examination at the request of Claimant's counsel.   On the WAIS-IV Claimant scored a 68 on verbal comprehension, a 77 on perceptual reasoning, a 77 on working memory, a 67 on processing speed and a full scale IQ of 67.   These scores placed Claimant in the lower extreme classification of intellectual functioning.   (Tr. at 327-28.)   On the WRAT-IV, Claimant obtained a 3.3 grade level word reading score and a 4.9 grade level math score.   (Tr. at 328.)   Ms. Walker diagnosed major depressive disorder, recurrent, severe without psychotic features and panic disorder on Axis I and low extreme classification of intellectual functioning on Axis II.   She rated Claimant's GAF at 40 and opined that his prognosis was guarded.   (Tr. 330.)   Ms. Walker opined that based on Claimant's low level of intellectual functioning and his psychological symptoms, Claimant "is incapable of sustaining steady gainful employment of even the light or sedentary type.   It is believed that Mr. Cook is incapable of managing his own benefits." (Tr. 331.)

Ms. Walker completed a Medical Assessment of Ability to do Work-Related Activities (Mental) as well and rated Claimant's abilities as poor to none in all categories. (Tr. at 332-33.)

Evidence Submitted to the Appeals Council

Claimant submitted to the Appeals Council, a Report of Occupational Injury related to his August 2000, coal truck wreck.   (Tr. 30.)   In addition, he submitted an authorization decision from Workers' Compensation authorizing two sessions of lumbar facet joint injections and three sessions of trigger point injections.   (Tr. at 31.)

Claimant submitted an x-ray report from Boone Memorial Hospital dated August 30, 2000.   This evidence is already contained in the record.   (Tr. at 224.)

Finally, Claimant submitted a CT scan dated October 10, 2008, and a CT of the abdomen and pelvis dated February 20, 2009.   (Tr. 337-39.)

Analysis

The court proposes that the presiding District Judge find that the ALJ's decision is not supported by substantial evidence.   In particular, the ALJ erred related to her findings involving Listing 12.05C.

In order to meet the criteria of Listing 12.05C, the regulations require that Claimant must meet the introductory language of Listing 12.05C, which states that "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2010); see also § 12.00A (stating that for Listing 12.05, claimants must satisfy the diagnostic description in the introductory paragraph and any one of the four sets of criteria).   Listing 12.05C also requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of

function."   20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2010).

Mental retardation is a life long condition and "in the absence of any evidence of a change in a claimant's intelligence functioning, it must be assumed that the claimant's IQ had remained relatively constant."   Luckey v. United States Dep't of Health & Human Servs., 890 F.2d 666, 668 (4th Cir. 1989) (citing Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir. 1985)).

In Luckey, the Fourth Circuit held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C.  Id. at 669.  A "severe" impairment is one "which significantly limits [one's] ability to do basic work activities."   20 C.F.R. § 404.1520(c) (2010).   In Luckey, the Court ruled that

> Luckey's inability to perform his prior relevant work alone established the significant work-related limitation of function requirement of § 12.05C. Further, the [Commissioner] has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities.  The [Commissioner's] finding that Luckey suffers from a severe combination of impairments also establishes the second prong of § 12.05C.

Luckey, 890 F.2d at 669.

In her decision, the ALJ explained that Claimant did not meet 12.05C because

> the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.   Ms. Walker indicated the claimant's full scale IQ of 67 was accurate, but then also noted he gave up too easily during testing.   The evidence, including the claimant's educational and vocational history, does not support the validity of the claimant's low IQ scores obtained during the evaluation by Ms. Walker.   Furthermore, there is no evidence the claimant had deficits in adaptive functioning initially manifested before age 22 as required to meet or equal the listing.   Although the claimant testified he was involved in special education classes, there is no indication of this in his school

12

records.  In addition, although he had poor grades in high school and repeated the 10ᵗʰ grade, his early elementary school grades were in the As, Bs and Cs (Exhibit 13E), and the claimant after leaving school worked for several years at a semi-skilled job which required a CDL.

(Tr. at 18.)

The ALJ states in her decision that Claimant did not have a valid IQ of 60 through 70, but this is not true.   While Ms. Walker stated that Claimant "gave up too easily," she also stated that Claimant's test scores, including a full scale IQ score of 67, were "an accurate estimate of Mr. Cook's current level of intellectual functioning."   (Tr. at 327.) There are no other IQ scores of record, and "[a]lthough the regulations permit the ALJ to consider evidence in addition to an IQ score, a general discussion of the claimant's activities and an ALJ's intuition are not sufficient to overcome medical evidence; the ALJ cannot substitute his [or her] own judgment and disregard IQ scores."   Rivers v. Astrue, Civ. Act. No. 8:10-cv-314-RMG-JDA, 2011 WL 2581445, at *14 (D. S.C. May 25, 2011) (citing Dozier v. Commissioner of Soc. Sec., 736 F. Supp.2d 1024, 1037 (D. S.C. 2010)), report and recommendation adopted by, 8:10-CV-00314-RMG, 2011 WL 2581447, at *4-6 (D. S.C. June 28, 2011).   In her decision, the ALJ does not elaborate in rejecting Claimant's IQ scores, beyond stating that Mr. Walker indicated that Claimant gave up too easily and that Claimant's "educational and vocational history, does not support the validity of the claimant's low IQ sores obtained during the evaluation by Ms. Walker." (Tr. at 18.)   The ALJ's decision ignores the fact that Claimant did not graduate from high school, repeated the ninth and tenth grades and received lower grades the closer he got to graduation until he eventually dropped out.   (Tr. at 218-19.)   Claimant's standardized scores were low.   (Tr. at 221.)   The ALJ's rejection of the IQ scores simply

13

is not supported by substantial evidence.   There is every indication that Claimant's IQ scores were accurate and within the range required by Listing 12.05C.   In addition, he suffered from a significant work-related limitation of function.

Regarding the introductory language of Listing 12.05C and the onset before age twenty-two, the ALJ's reasoning is complicated by the fact that she considered Claimant's past relevant work in determining whether he met the introductory language of the listing.   The ALJ "may not rely upon previous work history to prove non-disability where the section 12.05(C) criteria are met: 'When a claimant for benefits satisfies the disability listings, benefits are due notwithstanding any prior efforts of the claimant to work despite the handicap.'" Luckey, 890 F.2d at 669 (quoting Murphy v. Bowen, 810 F.2d 433, 438 (4th Cir. 1987)).   Furthermore, contrary to the ALJ's additional findings on this point, as noted above Claimant's grades in school were poor, particularly as he entered high school.   It was then that he repeated grades, received failing grades and eventually dropped out.   The ALJ's reasoning that his early elementary grades were As Bs and Cs is of little significance given the subsequently worsening grades that Claimant received as he proceeded through school.   The ALJ's determination that there "is no evidence the claimant had deficits in adaptive functioning initially manifested before age 22" is not supported by substantial evidence.   Instead, substantial evidence of record indicates that Claimant had deficits in adaptive functioning which did manifest before the age of 22.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge REVERSE the final decision of the Commissioner and REMAND this case pursuant to the fourth sentence of 42 U.S.C. § 405(g) for the purpose

of awarding benefits and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable John T. Copenhaver, Jr. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.   Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).   Copies of such objections shall be served on opposing parties and Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit the same to counsel of record.

    May 2, 2012      
      Date

Mary E. Stanley  
United States Magistrate Judge